# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

_____

MARK CONKLING,
Personal Representative of the Estate of
Bryan Conkling,

        Plaintiff,

        v.                                 Case No. 1:14-cv-00234-WJ-KBM

TRI-STATE CAREFLIGHT, LLC[1] and
BLAKE STAMPER, individually,

        Defendants.

## MEMORANDUM OPINION AND ORDER
## GRANTING IN PART and DENYING IN PART
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

THIS MATTER comes before the Court upon Defendant's Motion for Summary Judgment, filed February 10, 2017 **(Doc. 88)**. Having reviewed the parties' briefs and applicable law, the Court finds that Defendants' motion is granted with respect to the retaliatory discharge claim in Count I, but is denied with respect to the malicious abuse of process claim in Count IV.

## BACKGROUND

This is an employment discrimination case, filed in First Judicial District Court, County of Santa Fe, on January 13, 2014. Defendants removed the case to federal court on March 10, 2014 based on diversity jurisdiction. Bryan Conkling ("Bryan") worked as a flight paramedic and later as a base manager at Base No. 5 for Tri-State Careflight ("Tri-State"), an emergency medical services ("EMS") provider that provides air ambulance services in Arizona, Colorado,

---

[1] Tri-State was acquired by Air Methods in January of 2016, which assumed control of Tri-State's operations at that time. However, it was an independent company during the entire time Bryan Conkling worked for the company.

Nevada and New Mexico.[2]  Bryan contends that Tri-State and Dr. Stamper, owner of Tri-State, began to discriminate against him after he became ill in the summer of 2012 and had to take medical leave.  He alleges that when he returned to work, he was not permitted to work in Santa Fe as he had done in the past, but was assigned to the Gallup base and was demoted.  He eventually was returned to a position as a co-manager at the Santa Fe base, but found that position intolerable.  Bryan also alleges retaliation because he engaged in protected labor organizing activity when he informed certain governmental regulatory agencies about safety violations and violations regarding transport, storage and use of controlled substances.  Bryan was terminated from his position, and he contends that his termination was based on discrimination on the basis of his serious health condition and in retaliation for his protected labor organizing activity and for reporting safety violations.

Defendants move for summary judgment on Counts I and IV, asserting retaliatory discharge and malicious abuse of process.  Count III alleged a violation of the New Mexico Human Rights Act, NMSA 1978, §28-1-7(A), which the Court dismissed based on Plaintiff's refusal to comply with the Court's discovery Order.  See Doc. 82.  Also, Plaintiff has withdrawn his claim for defamation in Count II.  Doc. 98 at 1.

The Court recently denied summary judgment to Plaintiff on his claim for malicious abuse of process (Doc. 105).  Here, the Court addresses Defendant's motion for the same claim as well as Plaintiff's claim for retaliatory discharge.

I.      **Undisputed Facts**

The relevant facts are grouped according to Plaintiff's claims.

---

[2] Bryan Conkling died intestate on September 2, 2015, during the pendency of this case, and his father Mark has been substituted as the named Plaintiff as his personal representative. See Doc. 72. The Complaint was amended to reflect that change. See Doc. 11.  The Court will refer to "Bryan" where necessary in order to distinguish the presently-named plaintiff from the original plaintiff in this action.

A.    Facts Relevant to Retaliatory Discharge Claim (Count II)

Plaintiff alleges two "public policies" to support his claim for retaliatory discharge: (1) public policy related to proper control and handling of narcotics "as expressed through rules and regulations regarding such control or handling" and (2) public policy related to the right of workers to engage in labor organizing activity.  Am. Compl., ¶¶28 and 30.

1.    *Facts Relevant to Falsification of Time Card*

On or about July 26, 2013, Dayna Blake, who was the Medical Program Director at Tri-State, and Bryan Conkling's supervisor, made the decision to terminate Bryan's employment. Defendants claim that Bryan was terminated for falsifying his time card, for insubordination and creating an unproductive work environment.   In her deposition, Ms. Blake testified that she informed Bryan of these reasons when she terminated him, and that he gave no explanation as to why his time card was falsified.  Ex. D at 52:1-8.  Plaintiff disputes this fact, claiming that Ms. Blake did not offer any explanation for why his time card was wrong, except that she told him he was being terminated for "insubordination" and "creating a negative work environment.  Bryan stated in his deposition that when he asked for "documentation," Ms. Blake told him "that was not necessary."  Ex. C at 58:20-22.

The Court also notes that the reasons given by Dr. Stamper for Bryan's termination are consistent with those given by Ms. Blake.  In his deposition, Dr. Stamper testified that Bryan "had a repetitive behavior of . . . of agitation, he was unresponsive, he was unhelpful, he falsified his time card, and he was terminated."  Ex, 16 at 52:19-21.

Shortly before Bryan's termination, Ms. Blake sent a message to Lindsey Ward, forwarding a message regarding a day when Bryan had arrived late for a shift. Ms. Blake's message said excitedly, "Would this be falsifying timecards???" Her message also included the

statement, "Please I am not targeting Bryan, I am treating him the same way I would any other manager." Ex. 18 (July 23 e-mail from Blake to Ward).[3] The time card in question indicated that Bryan clocked in at 8:00 am on June 20 and out at 8:00 am on June 21. Ex. 19.

For Additional Facts 18-20, Plaintiff offers Exhibits 18-20, claiming that these exhibits are evidence that Bryan actually worked well past 8:00 a.m. on June 21. While these facts are not rebutted by Defendant, the Court will not consider them here for the reasons given by Plaintiff because the exhibits do not support Plaintiff's representations.[4] Exhibit 18 includes Ms. Blake's e-mail to Ms. Ward which is described above, but it also includes an e-mail from a Tri-State employee, Jamie Butler that was forwarded to Ms. Ward on July 23, 2013 in which Mr. Butler that stated he has "great heartache and heartburn because of Bryan's actions." Mr. Butler also stated that "Bryan will not allow a solid team to form at CF5. By example and by action he is tearing down what is left of the pride in Santa Fe." He also stated that "fellow employees are afraid to file complaints against Bryan because he is 'unfireable' and everything gets back to him . . . He reportedly retaliates making the situation worse." Ex. 18. Plaintiff cites to Exhibit 20 to show that Bryan actually worked past 8:00 a.m. in the morning, although he did not adjust his timecard to reflect the additional time. However, Exhibit 20, which is a letter, does not show this at all. The letter mentions that time card only to state that another employee, Ed Rhue, agreed to cover Bryan's shift because Bryan had a doctor's appointment and that Bryan agreed to "come back at 8 p.m." *Id.* There is nothing in the letter mentioning that Bryan worked *past* 8:00 a.m. or

---

[3] Plaintiff does not explain who Lindsey Ward is, although the Court suspects she may be part of Tri-State's human resource department.

[4] This Court's local rules allow a non-movant to set forth "additional facts" in a response to summary judgment, but those facts must "refer with particularity to those portions of the record upon which the non-movant relies." D.N.M.LR-Civ. 56. Defendant does not rebut Plaintiff's statement of additional facts in the reply. However, where Plaintiff's Additional Facts are not supported by the proffered evidence, the Court is not required to consider those facts as undisputed. The Court provides an accurate description of the content of these exhibits even though those portions may not be cited by Plaintiff. *See* Fed.R.Civ.P.56(c)(3) ("The court need consider only the cited materials, but it may consider other materials in the record").

4

that Bryan did not adjust his time card to reflect this. Plaintiff not only mischaracterizes what Exhibit 20 states, but also omits language that constitutes the essence of the letter. This letter proceeds to describe Bryan as being divisive and hostile:

> Brian [sic] still would not stop jumping in, Dr. Rosen asked him again to stop! Brian keep [sic] going on, how he does what he does to save life's [sic] and everything he does is correct. If people were as smart as him, they again would take as Much [sic] time as him. [At] one point Erin walked out to avoid being mocked by Brian. At that time, Dr. Rosen told him, your [sic] very argumentative today and to stop. . . Erin could not ask or say anything without Brian mocking her or being aggressive towards her. At that point Erin walked out again. In my opinion Brian was manic and could not listen to Dr. Rosen, Erin or myself on anything. All he wanted to do was fight and argue about everything and no one could talk to him. I think this is not a good working environment and Brian should not come back tonight and fly with Erin.

Ex. 20.

In response to a complaint that Bryan Conkling made to the Occupational Health and Safety Bureau of the New Mexico Environment Department ("OHSB"), Blake Stamper sent a letter dated September 27, 2013 that informed the OHSB investigator that Bryan Conkling's employment at Tri-State had been terminated for theft and falsification of records. Ex. F; *see also* Ex. C (Bryan's Dep.) at 119:4-9 (admitting that submitting a false time timecard and getting paid for hours not worked would constitute falsification of records and theft). Dr. Stamper considered Bryan's taking compensation for work he did not do as "theft." Ex. E (Stamper Dep.) at 74:4-20. Dr. Stamper testified in his deposition that "the management team interviewed everyone involved, looked at the time cards" and that the conclusion was "that Bryan was not at work when he was supposed to be at work, yet he had his time card appear that he was." Ex. E at 74:20-24.

2.      *Plaintiff's "Additional Facts" Leading Up to Bryan's Termination*

Plaintiff presents Additional Facts 16 and 17 to show that prior to Bryan's termination, Tri-State management engaged in communications with one another to seek information that could be used to terminate Bryan. However, these facts also are not supported by the evidence presented in Exhibits 13-17. For example, Exhibit 13 is an e-mail from Ms. Johnson to Mark Swafford, R.N., the Clinical Services Manager, in which Ms. Johnson states that she would "prefer" that Swafford not transfer Bryan. Ex. 13. In forwarding Ms. Johnson's e-mail to Ms. Ward, Swafford stated only that he thought Ms. Ward "might find" that comment "interesting." Ex. 13.

Exhibit 14 contains a "synopsis of Bryan" written by Erin Johnson to Mark Swafford describing Bryan as "an extremely intelligent, calculated and capable paramedic."[5] Ms. Johnson also described Bryan as someone who is "idealistic" and "marches to the beat of his own drum." Johnson noted that it was a "struggle" to work well with Bryan because he "gets very upset when his idealism cannot be achieved" and that Bryan is "easily subject to bad moods and becomes angry and sarcastic." *Id.* Johnson ended the e-mail with the statement that he "look[ed] forward to new employees/managers seeing [Bryan] through an objective set of eyes and perhaps offering ideas to help us work through our own struggles." *Id.* There is nothing in this e-mail suggesting that any of these individuals were trying to set up Bryan for termination. Instead, Exhibit 14 appears to be a balanced assessment of Bryan's strength and weaknesses as fellow employee—which is exactly what Ms. Johnson intended.

In Additional Fact 16, Plaintiff refers to an e-mail from a co-worker named Kevin Napp sent to Mr. Swafford in which Mr. Napp made observations about Bryan during a shift he had with Bryan on January 12, 2013. He noted that Bryan's "knowledge of the area was better than

---

[5] Plaintiff does not identify who Mark Swafford or Erin Johnson is, or what roles they played in Bryan Conkling's employment with Tri-State.

even the pilot, but that "he was extremely slow on scene." Mr. Napp also noted that after they returned from the flight, Bryan "did not assist with either restock or paperwork and simply went home." Mr. Swafford forwarded Mr. Napp's e-mail to Ms. Ward and Ms. Blake, and Ms. Ward responded that she would "put this in Bryan files [sic]."

Plaintiff infers that there is something untoward and conniving about Ms. Ward's reference to a "Bryan file" in Exhibit 16 and in the fact that Dr. Stamper testified at his deposition that "[t]here were no Bryan files" and that he was ". . . surprised that you would refer to something like that." Ex. 17 (Stamper Dep. At 52:10-16). However, none of the Exhibits bears out the inference Plaintiff is trying to make. No reasonable fact finder would find that Plaintiff's Additional Facts 16-17 (Exhibits 13-17) suggest some kind of collusion between Tri-State managers to seek information that could be used to terminate Bryan. The Court need not consider facts that are not supported by a party's exhibits and therefore the Court will not consider Plaintiff's Additional Facts 16-17 for the purposes offered by Plaintiff.

3.      *Facts Relevant to Medical Leave and Union Activities*

Plaintiff also claims that Tri-State terminated Bryan because he took medical leave and because of Bryan's efforts to organize union activities, and presents Additional Facts 2 to 11 for support.

Bryan requested medical leave in 2012. When he was cleared to return to work, Bryan found that he had been transferred to a distant base requiring a lengthy commute and that he had been demoted from his position as manager which resulted in a pay cut. Bryan complained to Tri-State, informing a supervisor and Dr. Stamper that he had filed complaints with the EEOC and other entities. Ex. 1. Dr. Stamper responded directly to Bryan, agreeing to Bryan's request to reinstate him to his original position in exchange for Bryan's promise to drop his EEOC and

other complaints. Ex. 2. Dr. Stamper responded on several other levels as well. He explained that even though Bryan had been cleared for full duty with certain medical restrictions, it had been noted that Bryan "displayed signs of sleepiness and fatigue on the job." In light of the work restrictions placed on him by his doctor, Tri-State believed that "the best way to insure safety and patient care was to temporarily modify some of [Bryan's] job duties." Ex. 2. Dr. Stamper further stated that he was unaware of the concomitant pay cut, and assured Bryan that it was not the intent behind the job modifications. He instructed the accounting staff to calculate any back wages and back base manager pay to address that issue, and to reimburse Bryan for any mileage for work-related trips to bases other than CF5 (Base Camp No. 5).

Bryan did not return to the Santa Fe base with the same status he had previously held, but was instead made a "co-manager" of the base. Dr. Stamper stated in a letter to Bryan that while Bryan was to resume his position as a base manager at CF5, he was directed to work together with Jamie Butler who had been serving as base manager of that camp during Bryan's medical absence. Ex. 2. However, this working relationship was not successful. In a letter to Lindsey Ward dated May 23, 2013, Ms. Blake informed Ms. Ward that the "dual manager model for CF5 is not working as well as hoped," not due to anyone's fault, but because of "latent errors related to communication." Ex. 4.

On June 6, 2013, Bryan sent a letter to Dr. Stamper informing him of his intention to pursue union organizing activity. Ex. 5. Dr. Stamper responded in a letter, stating that while Tri-State supports the right of its employees to engage in union activities (described by Bryan as "lawful concerted activities"), Bryan was not entitled to participate in these activities because he was a supervisor at Tri-State. Ex. 6. On June 20, 2013, Bryan sent a follow-up letter to Dr. Stamper and others, asking for an explanation of Dr. Stamper's claim that Bryan was a

supervisor.  Ex. 7.  Bryan copied this letter to various government labor offices.  He also sent a letter to Tri-State employees describing efforts to organize a union.  Ex. 8.  Plaintiff's Additional Fact 10 states that Tri-State had previously been charged with violating the National Labor Relations Act ("NLRA") referring to Tri-State's answer to an Interrogatory stating that the National Labor Relations Board, on behalf of another employee, had charged Tri-State with violating the NLRA.  Ex. 9 at 5 (Suppl. Ans. To Interrog. No. 12).  Because the matter was settled and dismissed, the Court finds this fact to be irrelevant and immaterial to Plaintiff's lawsuit.  Additional Fact 10 also states that there were  "[n]o other findings of violation of laws pertaining to employee rights or safety were made in the two years preceding Plaintiff's termination" although this part of the interrogatory response is omitted by Plaintiff.

After being told that he was not permitted to get involved in concerted labor organizing activities, Bryan requested permission to resign from his management position in order to be permitted to continue organizing.  Dr. Stamper denied that request because he felt that it was "not in Tri-State's best interest to allow" the transfer and that Bryan would be kept in his current position as a Base Manager.  Ex. 10.

It is undisputed that Dayna Blake had no knowledge that Bryan was involved in any effort to establish a union at Tri-State.  Ex. D at 26:15-17.

### 4.     *Facts Relating to Narcotics Handling at Tri-State*

Bryan testified in his deposition that he had concerns about what he considered to be inappropriate inventory at Tri-State related to the transport of controlled substances between bases.  Ex. C at 65-66.  When questioned about specifics regarding his alleged concerns regarding narcotics control and handling, Bryan testified that "the out-of-state transportation of

resupply was something we [Tri-State] were not licensed to do." Ex. C at 62:11-14. Bryan stated that he raised this issue with the New Mexico Board of Pharmacy but not with the DEA:

> Q. And did the DEA ever confirm to you that they thought it was a problem to move controlled substances between bases?
> A. The New Mexico Board of Pharmacy – No, the DEA did not. I did not raise that question with the DEA.

Ex. C at 66:1-4. However, Bryan never asked the Board of Pharmacy to conduct an investigation into what he was describing as "interbase transport" of controlled substances, nor was he aware of any investigation taken by the Board. Ex. C at 66:1-4; 67:12-18. No government agency ever cited Tri-State or corroborated Bryan's allegations regarding the handling of narcotics at Tri-State.

According to Defendants' facts, Bryan spoke with someone named "Mr. Stark" from the Drug Enforcement Administration ("DEA") over the phone about "issues around procurement, inventory, transportation and security . . . [based on information] that "came from the New Mexico Board of Pharmacy." Ex. C at 66:7-14. Bryan never took any notes from these conversations and never submitted any concerns to the DEA in writing. Ex. C (Bryan Conkling Dep.) at 61:2-19; 63:15-24. He stated that he was "directed to [the DEA] website where there is a portal for making—for reporting" but did not remember if he kept a copy of the report he filed. *Id.*at 63:5-14, 24-25; 64:1. Thus, Defendants contend that the only record of the alleged complaints is Bryan Conkling's own testimony. Plaintiff disputes this contention, pointing to his written communications with Ms. Blake on July 25, 2013, in which he stated that he would not discuss the matter any further except in the presence of a DEA Special Agent. Ex. 11. In his letter to Ms. Blake, Bryan considered himself a "compliance advocate" and "problem solver with respect to areas of non-compliance, re-registration of licenses, and procuring CS medications."

Ex. 11.  However, evidence of Bryan's communications with his supervisor Ms. Blake does not rebut Defendant's position and supporting evidence that any claimed contact by Bryan with the DEA is non-existent except for his own deposition testimony.  Bryan also admitted that the DEA did not confirm that any of his concerns were valid or even that there had been any violation of law. Ex. C at 62:5-8; 63:1-3, 21-24; 65:24-25; 66:1-3.

      B.      <u>Facts Relevant to Malicious Abuse of Process (Count IV)</u>

Plaintiff bases his malicious abuse of process claim on the filing of a lawsuit against Bryan in Arizona, which resulted in a default judgment against him.

About a week after his termination, an "anonymous" posting appeared on a web site devoted in part to recruiting helicopter pilots. The posting stated, "As you might have heard, I was notified on Friday, July 26, 2013 of my termination from Tri-State CareFlight after almost 6 years." Ex. A. The posting specifically referred to "Bryan" and discussed the termination of his employment in the first person. *Id*.  The posting was identical to an e-mail that Bryan sent the day before the posting, except (as Plaintiff notes) for the fact that the e-mail Bryan sent was signed "Bryan" while the posting on the internet was signed "Fellow Pilot." Ex. B; Exs. 21 & 22. The posting contained numerous allegations of supposedly "factual, documented" events at Tri-State that attacked or impugned Tri-State's reputation for safety, among other things.  Dr. Stamper believed these representations were factually false and had caused damage to Tri-State and he and Tri-State filed a defamation lawsuit against Bryan in state court in Maricopa County, Arizona Superior Court.  Ex. E at 66:6-20.  Dr. Stamper stated that the purpose in filing the Arizona lawsuit was to "get Bryan . . . to stop defaming" Dr. Stamper and Tri-State.  Ex. E at 60:1-5.

Defendants relied upon the services of a professional process server in New Mexico and an Arizona lawyer who engaged that individual's services, to comply with their legal obligations with respect to service of process. Ex. H (affidavit of counsel of record in Arizona lawsuit).

The Arizona court entered a default judgment against Bryan Conkling in the Arizona lawsuit, and that judgment was never appealed and remains in full force and effect. Ex. K.

The remainder of Plaintiff's "Additional Facts" focuses on Order signed by District Court Judge Sarah Singleton in the First Judicial District of Santa Fe, New Mexico in ruling on a request to domesticate the Arizona state court default judgment by Defendants (who were plaintiffs in the Arizona lawsuit). The Order denied full faith and credit to the Arizona default judgment, finding that Defendants never properly served Bryan Conkling. Judge Singleton further found that the Arizona judgment was secured through fraud because Judge Singleton found that Defendants had represented to the Arizona court that Bryan had been served when in fact he had not. Ex. 3. The court found that this conduct was "unprofessional" and constituted "intrinsic fraud." Id. at 3. Judge Singleton also found that the court "lacked authority" to dismiss the default judgment in the Arizona Court. Judge Singleton's order formed the basis for Plaintiff's motion for summary judgment on the malicious abuse of process claim, which this Court denied. Doc. 105.

## II.    Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, the Court may grant summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the . . . moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986); *EEOC v. Horizon/CMS*

*Healthcare Corp.*, 220 F.3d 1184, 1190 (10th Cir. 2000). "A fact is 'material' if, under the governing law, it could have an effect on the outcome of the lawsuit." *Horizon*, 220 F.3d at 1190.

## DISCUSSION

### I.  Retaliatory Discharge

New Mexico courts created the tort of wrongful discharge "as a means of redress for the very limited situation in which an employee has no other means of protection against an employer's breach of public policy." *Silva v. Albuquerque Assembly & Distrib. Warehouse Corp.,* 106 N.M. 19 (1987) (*"Silva I").*

To prove retaliatory discharge, Plaintiff must establish that he performed acts authorized or encouraged by a clear mandate of public policy, that those acts caused his discharge, and that he was damaged as a result of the discharge. *Weidler v. Big J Enterprises*, 1998-NMCA-021, ¶ 18, 124 N.M. 591, 953 P.2d 1089; UJI 13-2304. Thus, if there is a statute prohibiting certain actions, courts view that as a statement of public policy which may be used to support the common-law cause of action.  *Id.* The employee's motivation must have been to further primarily the public interest and not his own private interests. UJI 13-2304; *Garrity v. Overland Sheepskin Co*., 1996-NMSC-032, 121 N.M. 710, 917 P.2d 1382; *Jeffers v. Butler*, 762 F. Supp. 308, 310 (D.N.M. 1990), aff'd in 931 F.2d 62 (10th Cir. 1991). "[C]ourts interpreting New Mexico law have adhered to the rule that retaliatory discharge is a narrow exception to the rule of employment at will and have refused to expand its application." *Shovelin v. Central N.M. Elec. Coop*., 1993-NMSC-015, ¶ 26, 115 N.M. 293.

#### A.  Public Policy Exception

The claim for retaliatory discharge requires an employee to show that he was discharged because he performed an act that public policy authorizes or encourages. *Chavez v. Manville*

*Prods. Corp.,* 108 N.M. 643, 647, 777 P.2d 371, 375 (1989). *Weidler,* 124 N.M. at 597 (N.M.App.,1997). Plaintiff has the burden to prove that their "claim comes within the strict confines of a legitimate public policy exception." *Maxwell v. Ross Hyden Motors, Inc.*, 1986-NMCA-061, ¶ 22, 104 N.M. 470, 473-474, 722 P.2d 1192. "A general allegation that the discharge contravened public policy is insufficient." *Vigil v. Arzola*, 1983-NMCA-082, ¶ 35, 102 N.M. 682, 699 P.2d 613, *rev'd in part on other grounds*, 1984-NMSC-090, 101 N.M. 687, 687 P.2d 1038, *and overruled on other grounds by Chavez v. Manville Prods. Corp*., 1989-NMSC-050, 108 N.M. 643, 777 P.2d 371.

The determination of a public policy exception is a question of law for the court to decide. *Wilburn v. Mid-South Health Development, Inc*., 343 F.3d 1274, 1277 (10th Cir. 2003). "Every statute enacted by the legislature is in a sense an expression of public policy but not every expression of public policy will suffice to state a claim for retaliatory discharge." Thus, unless an employee at will identifies a specific expression of public policy, he may be discharged with or without cause. *Shovelin v. Central New Mexico Elec. Co-op., Inc*., 115 N.M. 293, 303–04 (1993) (citing numerous examples of rejection by New Mexico courts of "public policies" raised by plaintiffs). *See, e.g., Salazar v. Furr's, Inc.,* 629 F.Supp. 1403, 1409 (D.N.M. 1986) (recognizing retaliatory discharge cause of action when employee discharged to prevent vesting of pension benefits); *Boudar v. E.G. & G.,* 106 N.M. 279, 280-81 (1987) (recognizing retaliatory discharge cause of action when plaintiff discharged for whistleblowing); *Vigil v. Arzola,* 102 N.M. 682, 688 (Ct.App. 1983), rev'd in part on other grds., 101 N.M. 687 (1984) (recognizing retaliatory discharge cause of action when plaintiff discharged for reporting misuse of public funds). New Mexico has narrowly interpreted the public policy exception to the rule of at-will employment, and New Mexico courts have refused to expand its application. *Shovelin,* 115

N.M. at 303. Whether an employee has stated a sufficient public policy to recover for the tort of retaliatory discharge is determined on a case-by-case basis. *Vigil,* 102 N.M. at 689.

Defendants contend that Plaintiff has not clearly alleged any "public policy" exceptions to support his claims because none of them comes close to a clear and specific public policy that Tri-State allegedly violated. In the Amended Complaint (Doc. 11), Plaintiff alleges two "public policies" on which he bases his retaliatory discharge claim (*see Am. Compl.,* at 7, ¶¶29-30) , and one other one mentioned for the first time in the response brief: (1) public policy related to proper control and handling of narcotics; (2) public policy which favors the right of workers to engage in labor organizing activity; and (3) public policy set forth in the New Mexico Human Rights Act ("Human Rights Act") which prohibits employers from retaliating against any person who has opposed any unlawful discriminatory practice or filed a complaint under the Human Rights Act.

### 1.    *Narcotics Control and Handling*

Plaintiff relies on the Controlled Substances Act, 21 U.S.C. §801(2) to support a public policy exception regarding the importance of control of drugs covered under the Act:   "The illegal importation, manufacture, distribution, and possession and improper use of controlled substances have a substantial and detrimental effect on the health and general welfare of the American people."

Defendants argue that this general invocation of the government's regulation of narcotics is insufficiently clear and insufficiently specific to satisfy the "clear mandate of public policy" element.   In his communications to Ms. Blake, Bryan expressed concern about Tri-State's committing a "serious DEA violation" in sending/receiving of controlled substances between bases, which could involve transportation across state lines.  Ex. 11.  However, there is little in

the way of specifics as to what Tri-State was doing (or not doing) that constituted a DEA violation. Bryan questioned whether Tri-State had the necessary level of license or whether it was appropriate to use an out-of-state pharmacy supplier to supply controlled substances. Ex. 11; Ex. B at 62:11-20. He also questioned whether Dr. Stamper was licensed in New Mexico which would mean he could lawfully prescribe for drugs administered in this state. Bryan was also concerned about the "lack of physical and environment security of deliveries" when the staff was out on runs. Ex. 11.

New Mexico case law has identified several categories of public policy exceptions: (1) statutes that provide protection of an employee without specifying a remedy (e.g., statutes that prohibit an employer from discharging an employee if the employee receives a summons or serves as a juror); (2) statutes which define public policy without specifying either a right or a remedy (e.g., being fired for refusing to commit a crime or perjury in violation of state statutes); and (3) instances in which the legislature did not express public policy but such policy was nonetheless recognized by a court (e.g., public policy implied a right and remedy for employee who was discharged for assisting in the investigation and prosecution of crime because public policy favors the exposure of crime and the cooperation of citizens possessing knowledge of crime). *See Shovelin,* 115 N.M. at 305 (cited case omitted).

Bryan's concern over narcotics handling does not fit into any of these categories. For an employee to recover under a retaliatory discharge theory, he must demonstrate that he was discharged because he performed an act that public policy has authorized or would encourage, or because he refused to do something required of him by his employer that public policy would condemn. *Vigil*, 102 N.M. 682, 689 (N.M.App.,1983). Bryan had ongoing e-mail discussions with Ms. Blake questioning whether Tri-State was licensed to transport drugs from one base

(clinic) to another, and Ms. Blake expressed an interest in resolving his concerns, telling Bryan that she had "participated in multiple conversations with the DEA in Albuqueruqe, NMBOP and our pharmaceutical consultant." Ex. 11 (Doc. 98-1 at 23).

A sufficient nexus must exist between the public policy asserted by the employee and the reasons for his or her discharge. *Vigil,* 102 N.M. at 689. Because the claim against the employer in most instances will assert serious misconduct, "proof should be made by clear and convincing evidence." *Id.* In this case, Bryan himself was not clear as to what rules and regulations were being compromised and whether Tri-State had violated them. *See* Ex. B at 65:9-16 (it was "not clear to me that we were licensed to do that"). It is undisputed that Bryan never submitted any concerns about narcotics in writing to any agency, he did not take notes from any conversation he had with "Mr. Stark" from the DEA, and he admitted that the DEA did not confirm that any of his concerns were valid. Bryan's concerns remained vague, testifying that "the out-of-state transportation of resupply was something we [Tri-State] were not licensed to do, Ex. B at 62:11-14, and that "management is complicated by removal and transfer and reconciliation, and *it was not clear to me that we were licensed to do that."* Ex. B at 65:15-18 (emphasis added). In fact, Bryan intended to get a third-party "to do some research to that effect." Ex. B at 65:9-16.

There are no specifics as to what Tri-State failed to do—or did—in violation of a public policy associated with the Controlled Substances Act. Plaintiff posits that the "transport of narcotics should be carefully controlled" (Doc. 98 at 21) but this statement does not stand for a clear mandate of public policy arising from the Act with regard to Tri-State's actions. *See, e.g., Turner v. Mem'l Med. Cntr.*, 911 N.E.2d 369, 375 (Ill. 2009) ("An employer should not be exposed to liability where a public policy standard is too general to provide any specific guidance or is so vague that it is subject to different interpretations" (internal quotation marks &

citation omitted)).  As a result, the Court finds that the Controlled Substances Act does not constitute a public policy exception.

2.    *Labor Organizing Activities*

Defendants do not seem to question whether public policy favors the right of workers to engage in labor organizing activity, but contend that this policy is not relevant here because there is no public policy favoring the right of management to get involved in labor organizing activities.  Because Bryan was a base manager, he has not identified a public policy favoring his right to engage in these activities. Defendants also contend that Bryan relies on the NLRA as a basis for this public policy exception, when there is some evidence that Tri-State was governed by the Railway Labor Act ("RLA"), and not the NLRA  *See* Doc. 88 at 12, n.4 (citing *Rocky Mt. Holdings, LLC d/b/a Eagle Airmed of Arizona (Eagle Airmed),* 26 N.M.B. No. 25 (Jan 12, 1999)).

Defendants contend that, as Dr. Stamper advised, Bryan was not entitled to participate in union activities because he was a "supervisor at Tri-State." Ex. 6.  Bryan asked for an explanation as to why he was considered a supervisor because the position of  "supervisor" is defined under the NLRA included the authority to hire, fire and promote. Ex. 7.  Plaintiff's Exhibit 28 describes the job duties of a Clinical Base Manager.  While an employee hired for this position does not have the authority to hire, fire, promote or assign duties, he is required to perform certain management functions such as managing medical supplies, evaluating the medical staff and directly managing and coordinating all base clinical needs, and reports directly to "relevant "Managers/Directors."

Bryan sent a follow-up e-mail to Dr. Stamper stating that he had contacted a senior attorney the National Labor Relations Board ("NLRB") who advised him that the NLRB

"presides over this decision" and that "[t]hey are unable to find cause or precedent supporting any limitation of my right to partake in protected concerted activity."  Ex. 10.

There are significant problems with the evidence presented by Plaintiff to show that his job position at Tri-State did not preclude him from engaging in labor organizing activities.  First, his own interpretation of the law as to whether his job description differed from "supervisor" as defined under the NLRA does not qualify as a relevant fact or legal authority.  Second, the legal opinion he supposedly obtained from the NLRB is not worth much more, as it would have been based on Bryan's self-description of his job position.  There is, however, evidence which strongly suggests that even Bryan knew that federal labor law precluded him from organizing unions.  As Defendants observe, he would not have asked for a demotion to Flight Medic if he genuinely believed that as a base manager, he was entitled to engage in such activities.

As a result, Plaintiff has not succeeded in establishing a clear mandate of public policy based on *his* right to engage in labor organizing activities.  Other than Bryan's self-serving opinion and hearsay, Plaintiff offers no facts or legal authority which dispute Tri-State's facts showing that as a base manager, Bryan was not entitled to pursue labor organizing activities.  Even assuming that Plaintiff did present such facts, however, this claim would fail on the causation element, which the Court will take up later.

### 3. EEOC Charges—Human Rights Act

Although not included in the Amended Complaint, Plaintiff presents an additional "public policy" exception in the response, based on EEOC charges that were filed.  To be sure, the Human Rights Act can provide a public policy exception as a basis for a retaliatory discharge claim.  *See Silva v. American Fed. Of State, Cty, and Municipal Employees et al.,* 131 N.M. 364,

367 (2001).  However, as the Court will discuss under the causation element, below, this theory does not leave the starting gate based on the undisputed facts.

B.      Causation

Defendant contends that Plaintiff cannot prove that Tri-State terminated Bryan's employment either because of his complaints to the DEA, his labor organizing activities (even assuming these ARE public policy exceptions), or his EEOC complaints.

1.      *Narcotics Control and Handling*

In the previous discussion, the Court found that the Controlled Substances Act does not constitute a public policy exception for a retaliatory discharge claim. However, as Defendants note, Plaintiff presents no material facts which suggest that Tri-State terminated his employment because of his complaints to the DEA.  While Bryan testified that he had contacted the DEA field office and that he had spoken to an investigator, there is no evidence that Ms. Blake was concerned about it or that it was a factor in her decision to terminate Bryan.  In fact, based on the dialogue between Ms. Blake and Bryan on the subject of narcotics shipping between clinics, Ms. Blake engaged in efforts to resolve the issues and concerns perceived by Bryan.  There is, however, considerable evidence that Tri-State was concerned about numerous complaints about Bryan's behavior, his insubordination and creation of an unproductive work environment, as well as the falsification of his time card, and that these were the reasons for his termination.  Plaintiff offers no evidence challenging these facts.  Thus, even if Plaintiff had identified a public policy exception under the Controlled Substances Act, he has not presented any facts which satisfy the causation element for a retaliatory discharge claim.  There is no evidence that Bryan was terminated because he performed an act that public policy would encourage, or because he

refused to do something required of him by his employer that public policy would condemn. *See* *Vigil*, 102 N.M. 682, 689 (N.M.App.,1983).

2. *Labor Organizing Activities*

Assuming that Plaintiff's position as a Base Manager was not a supervisory position, and that Plaintiff has identified an entitlement to engage in labor organizing activities sufficient to qualify as a public policy exception, there are no facts to suggest that Bryan's union-related activities played any role in Ms. Blake's decision to terminate him. It is undisputed that Ms. Blake was unaware of Bryan's labor organizing activities, and Plaintiff does not argue (nor is there any evidence) that anyone but Ms. Blake made the termination decision, and thus it is irrelevant whether Dr. Stamper was aware of Bryan's efforts to establish a union. *See* Ex. D at 48:1-3; Ex. E at 75:9-13. Moreover, the evidence shows that Dr. Stamper believed that Bryan had actually ceased these activities, based on what Bryan had told him. Dr. Stamper requested that Bryan confirm whether he understood that he was not entitled to participate in union-based activities under the NLRA (Ex. 6), to which Bryan responded: ". . . I will respect your direction to refrain from either [organizing or "concerted activity"] until a clear legal determination can be made by the proper authority."

There is also no evidence that Ms. Blake was told about Bryan's labor organizing activities by Dr. Stamper. Thus, because Ms. Blake alone made the decision to terminate Bryan, and because Plaintiff presents no evidence suggesting that Ms. Blake was aware of Bryan's participation in union-related activities, the causation element is not satisfied. *See Petersen v. Utah Dept. of Corrections,* 301 F.3d 1182 (10th Cir. 2002) (no retaliation where retaliatory supervisor was unaware that employee engaged in protected opposition); *Carney v. Pena,* 992

F.Supp.1285, 1293 (D.Kan. 1998) (summary judgment granted on Title VII retaliation claim where person who designed the schedule change did not know plaintiff had filed a complaint).

### 3. EEOC Charges

Bryan was terminated by Dayna Blake on July 26, 2013. The only EEOC charge that Plaintiff submits to the Court is Bryan's *post*-termination EEOC charge, filed on August 7, 2013. Ex. 12 and thus, Bryan cannot argue that he was terminated *because* of engaging in this protected activity. *Cmp. Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 n.2 (10th Cir. 1999) (in Title VII retaliation case, adverse action has to come after protected activity, not before); *Mass v. Martin Marietta Corp.,* 805 Fsupp. 1530, 1541 (D.Colo. 1992) (holding that civil rights retaliation claim was not reasonably related to a discrimination claim where plaintiff sought to base the claim on acts that had occurred before he filed his charge with the EEOC); *Gunther v. County of Washington*, 623 F.2d 1303, 1314 (9th Cir. 1979), *cert. granted*, --- U.S. ----, 101 S.Ct. 352, 66 L.Ed.2d 213 (1980) (where plaintiff's complaints regarding alleged discriminatory treatment did not occur until after he was discharged, there was no "causal link" between his protests and the adverse employer action").

There is also a mere reference in one of Plaintiff's exhibits, without any accompanying facts or discussion, to an earlier EEOC charge in an e-mail dated "Mar 16" sent to an individual named "Corin" and blind-copied to Blake Stamper. The e-mail, purportedly from Bryan, states that he "filed a formal complaint with The Federal EEOC Office [sic]." Ex. 1 (Doc. 98-1 at 2). Plaintiff offers no evidence at all that Ms. Blake received the charge or saw this e-mail—much less that it played a role in her decision to terminate Bryan on July 26, 2013. An EEOC charge that was made at *least* four months before Ms. Blake terminated Bryan is insufficient on its own to create an inference of retaliatory motive or causation in a retaliatory discharge claim. *See*

*Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1231 (10th Cir. 2004) (six-week period between protected activity and adverse action may be sufficient, standing alone, to show causation, but a three-month period, standing alone, is insufficient); *Hysten v. Burlington Northern & Santa Fe Railway Co.*, 296 F.3d 1177 (10th Cir. 2002) (almost three months between time of plaintiff's lawsuit and alleged retaliatory act was not close enough to establish causation); *MacKenzie v. Denver, City and Co.,* 414 F.3d 1266 (10th Cir. 2005) ("[u]nless an adverse action is *very closely* connected in time to the protected activity, a plaintiff must rely on additional evidence beyond mere temporal proximity to establish causation") (emphasis in original).

Thus, Plaintiff's retaliatory discharge claim fails under the public policy exception based on the EEOC charges.

## II. Malicious Abuse of Process

The elements of the tort of malicious abuse of process are (1) use of process in a judicial proceeding that would be improper in the regular prosecution or defense of a claim or charge; (2) primary motive in the use of process to accomplish an illegitimate end; and (3) damages. *Curham v. Guest,* 2009-NMSC-007,¶31 (citing *Richardson v. Rutherford,* 1990-NMSC-015, ¶23)). In any malicious prosecution claim, "the use of process for an illegitimate purpose forms the basis of the tort . . . some definite act or threat not authorized by the process." *Id.* A plaintiff can prove the first element of a malicious abuse of process claim either by establishing either (1) that the filer of a complaint lacked probable cause, or (2) that there was an "irregularity or impropriety suggesting extortion, delay or harassment." *Lenscrafters, Inc. v. Kehoe,* 2012-NMSC-020, ¶30.

The Court recently denied summary judgment to Plaintiff on this claim. *See* Doc. 105. In that motion, Plaintiff argued that the facts relating to findings of fraud in Judge Singleton's Order

entitled Plaintiff to summary judgment on the malicious abuse of process claim in Count IV. As the Court noted in its Memorandum Opinion and Order (and in the fact section above), Judge Singleton refused to grant Defendants full faith and credit to the Arizona default judgment because defendants never properly served Bryan Conkling. Judge Singleton further found that the Arizona judgment was secured through fraud because Defendants had represented to the Arizona court that Bryan had been served when in fact he had not. Ex. 27. The court found that this conduct was "unprofessional" and "constitutes intrinsic fraud. *Id.* In denying Plaintiffs summary judgment on this claims, this Court found that Judge Singleton's Order did not entitle Plaintiff to summary judgment on his malicious abuse of process claim in Count IV, but that it did create material factual disputes for the elements of that claim.[6]

In the instant motion, Defendants now seek summary judgment on Count IV. Defendants contend that Plaintiff has not met the elements of a malicious abuse of process claim. First, Defendants claim that Plaintiff cannot show improper use of process in a judicial proceeding either from lack of probable cause or because of an irregularity or impropriety suggesting extortion, delay or harassment. They point to the fact that the Arizona lawsuit was successful: Defendants did obtain a default judgment against Bryan. Defendants claim that they relied on the services of a professional process server in New Mexico and an Arizona lawyer who engaged the services of that process server, and that even if the service of process was ineffective or mishandled, such conduct does not constitute the kind of ill intent ("extortion, delay or harassment") on the part of Defendants themselves that the law requires to pursue a malicious abuse of process claim.

---

[6] This Court did not give Full Faith and Credit to Judge Singleton's Order under 28 U.S.C. §1738 because it was not a judgment to which this Court may defer. The Court further found that issue preclusion did not apply to whether Defendants' conduct in seeking domestication of the Arizona default judgment constituted fraud because Defendants did not have an opportunity to fully and fairly litigate that issue. Doc. 105.

Defendants also contend that Plaintiff presents no evidence to establish the second element—that a primary motive in the use of process was to accomplish an illegitimate end, because Plaintiff has not identified an alleged "illegitimate end" nor produced evidence that Defendants were motivated to achieve that end, other than a successful judgment and the hope that the lawsuit would stop Bryan from defaming Tri-State.

Defendants' arguments are sound except for the unavoidable fact that in her order denying full faith and credit to the Arizona state court default judgment, Judge Singleton found that Defendants had engaged in intrinsic fraud. According to the court's findings, lack of proper service was more than an oversight; rather, Judge Singleton found that Arizona counsel were in possession of information indicating that Bryan had not been served, yet represented to the court that he had been served. Ex. 27 (Doc. 98-1 at 64).[7]

At this point, there is no evidence that counsel for this case participated in, or were even aware of, the service issue in the Arizona case or of the misrepresentations made by Arizona counsel in that lawsuit. However, Judge Singleton's Order is sufficient to create a material dispute of fact on at least one of the elements of a malicious abuse of process claim. It is enough to require that this case proceed to trial in order to resolve whether Defendants played any part in the conduct referred to by Judge Singleton as "intrinsic fraud" relating to the service of Bryan Conkling in the Arizona lawsuit. For this reason, Defendants are not entitled to summary judgment on this claim.

## CONCLUSION

In sum, the Court finds and concludes on the retaliatory discharge claim:

---

[7] There is no mention in any of the briefs regarding an appeal of Judge Singleton's Order denying Full Faith and Credit to the Arizona default judgment.

(1) that Plaintiff has not presented a public policy exception under the Controlled Substances Act. Further, even if Plaintiff had identified such an exception, he cannot satisfy the causation element for a retaliatory discharge claim;

(2) that Plaintiff has not presented a factual dispute as to whether he was entitled, as a base manager at Tri-State, to participate in labor organizing activities and thus has not established a public policy exception under that theory. Further, even if Plaintiff had established such an exception, he cannot satisfy the causation element because Ms. Blake, who alone was responsible for the termination decision, was unaware of Bryan's labor organizing activities; and

(3) that while the Human Rights Act offers a public policy exception for purposes of a retaliatory discharge claim, as a matter of law, the EEOC charges at issue here cannot satisfy the causation element. One charge was filed after Bryan was terminated, and an earlier charge referred to in one of Plaintiff's exhibits is too remote in time to suggest a connection between the filing of that charge and retaliatory conduct on the part of Defendants.

For these reasons, Defendants are entitled to summary judgment as to Count I (retaliatory discharge).

The Court further finds and concludes that Plaintiff has presented a material dispute of fact on the elements of a malicious abuse of process claim in Count IV, based on Judge Singleton's state court order denying Full Faith and Credit to the Arizona state court default judgment Defendants obtained against Bryan Conkling. Accordingly, Defendants are denied summary judgment as to Count IV.

**THEREFORE,**

**IT IS ORDERED** that Defendant's Motion for Summary Judgment (**Doc. 88**) is hereby GRANTED as to the retaliatory discharge claim in Count I, and DENIED as to the malicious abuse of process claim in Count IV.

_____
UNITED STATES DISTRICT JUDGE